Good morning, Your Honors. Chief Judge Gregory, members of the panel, may it please the Court. I'm Richard Hawkins of the Hawkins Law Firm. I'm here this morning on behalf of the appellant and the plaintiff, Regina Webster. We are here in this appeal from a grant of summary judgment from the District Court as to the defendant appellee, Chesterfield County School System's motion for summary judgment on Miss Webster's sexual harassment claim. I think Judge Hudson correctly described the facts of this case as delicate and I will not repeat them here except where necessary to discuss issues of fact. Where I think the District Court went wrong, and I believe it did so dispositively, is to three key legal errors and they permeate the District Court's decision just by way of a preview of sorts. Those issues are that the District Court required evidence of intent, sexual intent, for purposes of the because-of-sex requirement for Title 7 sexual harassment claim. The District Court imposed a higher burden of proof or higher burden of evidence for purposes of showing the objective component or the objective prong of the severe and pervasive prong of the sexual harassment claims under Title 7. And then the third error of law that the District Court made is that it failed to view the evidence in light most favorable to Miss Webster's sexual harassment claim. And that's the issue of intent. The District Court specifically, it didn't say it did this, but it absolutely did this, held that evidence of intent in the context such as this one, and of course this is a unique context. We are dealing with a special education student who suffers from significant intellectual and mental disabilities. I don't think there is any question that this individual, this child, cannot form the requisite intent if it is so required. But we believe the law does not require that. We believe the law... Well, it requires it to be based on sex. So how could it be based on sex when the student was incapable of distinguishing between the male and female gender? We look at what the conduct was, the effect of the conduct. And I think the Crist decision out of the Eighth Circuit provides the best analysis. It says that we look at comparative behavior. Yes, the student could not distinguish, but the student did target females and female staff more so than male staff. Counselor? Yes, ma'am. I don't understand this point, the comparator evidence point. Who's the comparator? Who's the adult male staff member who was not targeted? Well, there are others. There was Mr. Johnson, who was the vice principal. But who was in the classroom trying to control the behavior of this child? That's the comparator. When, I mean, all the expert testimony is that this is very natural behavior for this child. When someone is trying to sort of control his behavior, he, this is how he defies those efforts. And I don't think there is any question and I don't, I don't understand. It looks like I don't see any references anywhere in the record to another adult male in that classroom. You will see in the point sheets, and those are the colored sheets with the smiley faces, there are repeated references to a Mr. Johnson. And you will see that, and I don't want to overstate the record. I understand your point very, very correctly is that within the classroom setting itself on the full day basis, there was no other male who was there for the entire period of time. However, there was a male who repeatedly assisted that room. And you will see repeated references in the record to Mr. Johnson taking the student, taking, he went to go take a walk through the hallway with, with Mr. Johnson. That is your comparator. And we submit that the evidence is sufficient, viewed in the light most favorable to Ms. Webster, to show that he is a proper comparator. And we didn't identify much more than that. But you will look at Ms. Webster's declaration, and she says that he engaged in behavior that targeted females more so than males. No, that's not what she said. She says that he inappropriately touched both male and female students. That's the comparator. Correct. But he more frequently touched female adults, period. I don't see where she says he more frequently touched female adults than male adults. And I expect that's because there were no male adults in the classroom on a regular basis. Which puts her in a tough spot, understood. I understand. I would, I would say that's more an artful sentence than it is to go by the evidence. But it's the only thing in the record. It's not as though there's anything else in the record about how often Mr. Johnson was there. I mean, that's it. That's what you rely on, because that's what's in the record. That is one piece of the record. We also look at the testimony of Ms. Ellerbe. And her deposition testimony made a distinction between male adults and female adults. And we submit that that is appropriate. Again, we don't have to identify the specific person involved, although I believe the record reflects that that person would most often be Mr. Johnson. But even, even if the Court were to conclude that Ms. Webster's declaration testimony is not in and of itself sufficient, the deposition testimony from Ms. Ellerbe on that point is sufficient to establish a question of fact. Ms. Ellerbe said that, that S.M. touched female adults more often than male adults. She said she wasn't aware of male adult touching. Is that right? I believe that is what she said. It's okay. I think it was that, not aware of male adult touching. My point in saying this, and again, I understand the Court's concern, but I think the evidence creates the reasonable inference that S.M. engaged in behavior that was more targeting of males, or, I'm sorry, more targeting of females than males. I think it's also... What does that mean, targeting? I thought you said intent didn't matter, and also that he, the student could not distinguish between male and female gender. So I still don't understand how you meet the because of sex requirement. Targeting may be a poor choice of words. Because it sounds just like intent. Well, it's conduct. The conduct affected the... So the fact that this student touched a teacher that was a woman. Correct. That's it, based on sex. Even though the student could not distinguish between the male and female gender. I submit the record gives just a little bit more of a picture with regard to the student's behavior as to male adults. But the instances that we are describing here are uniquely targeted towards sexual organs. These are not... I mean, there's abundant evidence in the record that this was a child who had behavioral problems, who spit, who threw things, who was... So I guess that goes to my other... So if there is a claim at all, before we even get to summary judgment, if there is a claim at all for student toward teacher under title here, then, and this is common behavior for students that have, at least the record indicates and the experts indicate that this is common behavior for students that have intellectual and emotional disabilities, then they are educated where? They remain educated in the public school system. Well, if there's a claim to be made by teachers against students, not just this student, it could be all the students. Certainly. So then what? Well, then we have situations where we have to adapt. We have... How? Well, I'll try to put on my educator hat for a moment. And I would say that one thing you could do, which ultimately happened here, for example, is that you separate this particular aid and you separate the student. How is that possibly a solution? I don't understand. On your hypothesis, right, this is, LRB's classroom is abusive and it's a hostile work environment for women. We don't usually say, oh, we fixed the problem. We took one woman out and we threw a different one in. That doesn't address the problem. Well, I think in this particular instance, Ms. Webster was the, I'll say the word target, she is the person that this particular student latched onto and engaged in this behavior in much more instances of egregiousness than with anybody else, whether it be Ms. Webster's classroom. Yes. What I think makes this case so difficult, and I think the district court talked about this, is, right, usually in these cases of a hostile work environment based on sex, the question is, did the employer sort of step in and fire the offending employee or cut off the offending customer? But that's not an available option for a school district because all of these students are entitled to a free public education. They're entitled to be mainstreamed into the classroom. So there's a way more limited kind of range of responses available to the school. And I just don't, I mean, I guess I understand what you're saying, maybe, that this particular plaintiff was a particular target. But if the idea is that the presence of this child and children like him in a classroom is going to be enough by itself to create a hostile work environment, is that a problem? I'm just repeating Judge Thacker's question. I'm sorry. What do you want these schools to do? They are great questions. And Judge Hudson very thoughtfully asked me exactly those questions. And I think the answer is, it's multifaceted. The first part is that SM here engaged in, despite the expert testimony about what is or is not expected from a child of these disabilities, he engaged... I think the appellant agreed with it. Ms. Webster agreed with it. Okay, go ahead. Well, right. That this is the kind of behavior that you see. But his behavior was above the norm. It was beyond the pale. Was there an expert who said that? Because there were two experts who said, no, it wasn't. Was there an expert who said, yes, it was? There was not. And we submit that there was not one necessary. Why not? Yes, sir. Why not? Because the fact of the egregiousness of the conduct is sufficient to allow a reasonable person. Yeah, but how do you have the egregiousness, I'll use your words, of the conduct, use your word, how do we know it's not in the sphere of the child acting as the experts have said within their exceptionality? Well, you look at Ms. Ellerbee's testimony here and Ms. Ellerbee said that no other child had had any other complaints, anything close to the conduct that SM engaged in. And I think that's the crucial point. And the Gardner case that we cited to the court, which involved obviously an older, demented individual, but there was no expert testimony in that case. But your problem is that there's a spectrum in many of children who have exceptionalities, there's all kinds of spectrum, for example, not in this case, but autism, for example, it can present itself in very mild, almost subclinical to very, very pronounced behavior. But that doesn't mean that every child in the classroom is on the same spectrum and you have no evidence that that's the case, that he is, you know what I'm saying, this is a case that bags up some, because of the complexities of it, that it bag of an expert, at least on your side to say, no, they're wrong, that this child is not, you know what I'm saying? I mean, assuming that if such exists or was available. I do, but I don't think the law requires that. And I don't think this case requires that. And I'll, I'll explain. Well, in this case, though, I'm sorry, go ahead and answer. Okay. In this case, though, if there is a claim to be made of student on teacher harass, sexual harassment, it could undermine the entire educational system for children with special needs. I don't believe that. Well, I don't know why not, because it's, you, you told me earlier that based on sex, just, um, he targeted this teacher, even though there are no other male teachers in the classroom, and, um, uh, he could not identify, distinguish between male and females, but you said that was enough. If this is typical behavior based on what the experts said, then what to do in the, in, in the classroom. Well, you, you said earlier isolate, I guess you meant isolate, um, Ms. Webster, isolate Ms. Webster or isolate. Okay. They, and they tried to take Ms. Webster out of the classroom and she complained about it and wanted to go back in the classroom. And when, um, Rucker, um, she complained to Rucker and Johnson about the switch. And when they offered to meet with her, she declined the offer several times. And that's at JA 50 through 56. So I don't know. And that's an issue of, and I take that point very seriously. That would go to the question of imputed liability. Um, to go backwards though, to start in September when the behavior started, when the pull up the dress, when the, when the, uh, show everybody in the class her underwear happened. And when the, the walking to and from the classes with the daily assaults, um, when that happened, absolutely nothing was done and there were repeated complaints about that behavior by Ms., uh, Ms. Webster. Uh, and, and I think that right there would be sufficient, is sufficient, uh, to establish a sexual harassment claim under Title VII. And then do what? Move her? And then, and, and then there's a question, you know, and, and, and I think the district court analyzed this, um, I think thoughtfully, uh, I think the court here could do the same thing and say that her response in November or December was unreasonable and that would probably end liability at that point. However, all preceding events would still be at issue and would still be subject to the claim. Um, can you just, and I, this, I think maybe mixes your second and your third points, but if you can tell me one, one question I have is what is it the school had to be on notice of? Um, you know, I, I'll just sort of assume for a minute that there's a genuine dispute on this record about whether anything was told to the school in September, but, um, assuming something was, it's apparently sort of in the hallway, sort of complaints about this SM kid keeps. Pushing up my skirt and things like that. Um, based on the expert testimony, this is my concern, sort of based on the expert testimony on this sort of second prong, what, what would a reasonable special education teacher experience as sort of hostile and abusive as opposed to normal behavior? I'm worried that Rucker, even assuming he's told in the hallway, man, like this is a tough assignment, this SM kid keeps pulling up my skirt, would not understand that as a complaint that I have a title seven complaint here about a hostile and abusive workplace, but would instead assume with the two experts who testified, yes, that must be somewhat off-putting, but you're a special education teacher. So I imagine you understand this is an outgrowth of SM's disabilities and it is not abusive and humiliating behavior. Do you understand what I'm saying? I do. And I think that my time is going to expire here. I was going to hope to address that, but go ahead. No, you, no, you may answer Judge Harris question. What I was going to say is that even assuming that that would be somewhat ambiguous in the context we're dealing with, she did complain directly about the, the, the grabbing of the private areas front and back to Ms. Ellerbee in that same timeframe. And she did so on a regular basis. And she told Ms. Ellerbee about these instances when they happen. There was a huge dispute as to whether or not Ms. Ellerbee recorded those instances, but she told her, and that right there would be sufficient to place an educator and an administrator on notice. At that point, it becomes Ms. Ellerbee's burden or obligation to go higher. And she specifically testified she did not do so. Your Honor. No, I had no question. I was just letting you know, you said your time was up. Letting you know you could go. I appreciate it. Thank you. I'll address rebuttal. Just one, I do one question. See, that's the danger of seeing, inviting, never invite a judge to ask a question. No, but do you have anything in the record that would say that, and I want to put this dedicately, because I don't mean this in terms of your client, I think is in good faith, that's not even a question, but is anything in the record that what, what she experienced would be different vermin? Because you say it's because in response to the question, the good question Judge Harris asked while being reported, they would say, well, this is a tough case and, but that's expected. Do you have anything that would say that this is beyond what, like peers who are similarly, uh, uh, in part the educational process for children of his exceptionality? Do you have anything like that in the record? Like, for example, she's, uh, they're normally at a level five, but this conduct put her at a level 10. You know what I'm saying? Do you have anything like any semblance of that in this record? I believe Ms. Ellerbee's testimony, and it's JA 503, 505, 507, and 509 through 513, where she testified that nobody else, she had received no complaints of any kind related to any behavior that was remotely similar to what SMN was, was engaging in. And I think that distinguishes his behavior and puts it kind of at the apex of what we would expect. Yes. I mean, and I also, um, you know, it sounds like this was a very difficult circumstance, and I am certainly not suggesting, I don't mean to be understood to be suggesting anything negative when I ask. I mean, isn't it also consistent with the defendant's position that, um, uh, most special education teachers would not, in fact, complain about conduct like this? Because Ms. Ellerbee says, I don't get complaints like this. And I thought that was sort of defendant's point. Of course you don't. The reasonable special education teacher understands that this kind of comes with the territory. Well, I would say that the questions that I asked Ms. Ellerbee and the answers that she gave weren't confined to the special education context. And you may recall that in the record, these students do interact with general education students. They have some combined classes. So I believe that her response would allow for a factual inference to say that perhaps it goes to special education people and perhaps they would not report that. But I think the question encompasses anybody at the school system. And I think that in and of itself would allow for an appropriate dispute of fact. Thank you. Thank you so much. Ms. Russell. Good morning. And may it please the court. I'm Emily Russell with the Chesterfield County Attorney's Office. And with me this morning is Jeff Minks, the County Attorney. We're here on behalf of the school board. I wanted to address right off the bat the court's question about Ms. Ellerbee and whether it was her burden. I believe that was the word that Mr. Hawkins used to escalate or elevate Ms. Webster's complaints if they were construed as complaints. And I think that the record is clear that Ms. Webster knows how to make a complaint when she'd like to. We see that from her injury reports, which were quite numerous. And we see that from her sexual harassment complaint to HR after the March 13th incident. And I think that when you look at Ms. Ellerbee's testimony in her deposition at 5-0-4, what you, I'm sorry, at 5-12, what you see is that Ms. Ellerbee herself tells Mr. Hawkins, I have been touched by Sean. And I addressed it. I moved on. And that was that. And it didn't upset me. He's not the only student who has done that to me. So I think the Court clearly understands that this is something that Ms. Ellerbee did not understand to be a complaint that would rise to the level of sexual harassment. Those words were not used. And what's clear from the record is that when Ms. Webster did use the word sexual harassment, it was immediately treated as a Title IX complaint. It was investigated. Yes. So I want to back up on that. Does APELI concede that a student on teacher sexual harassment claim is actually cognizable under Title VII? Yes, ma'am. Based on what? Your Honor, what we believe is that. Is there any circuit authority for that? We believe that it is analogous to a third party sexual harassment. So where people are equal, there's an imbalance here between student and teacher. It's a whole different situation. Judge Thacker, I wouldn't imagine you'd want to concede that in in the context of special education students. We agree with you, Your Honor, that this is a power imbalance. And the Western District of Virginia, who has actually heard a sexual harassment case dealing with student on teacher harassment in Dean versus Shenandoah County, recognized that power imbalance and said that a teacher's power court case. Yes, ma'am. In 2017, a teacher's power and authority over students strips students harassing conduct of much of its threatening character and ultimately found that there was no harassment in that case. To answer your question, what we believe is that the U.S. Supreme Court has told us that social context and common sense must be applied in Title VII sexual harassment cases. And that, in this case, it particularly applies on the severity or frequency of the conduct question. And you can't ignore the social context of this case. You can't ignore the power dynamic between an 8-year-old who's up to your knee and a woman in her 50s who has 12 years of experience and training in working with these children. She's been spit on. She's been grabbed. She's been urinated on. And this is her profession. So the school board acknowledges that it is an employer for purposes of Title VII and it does not eschew its liability if it were considered to be liable under different facts and circumstances. But the facts and circumstances of this case just do not rise to the level of a hostile work environment. So we think that as an employer under Title VII, there is no different standard. There is no different test. It's still the four elements of a hostile work environment claim. But what's so important in these cases is social context and common sense and thinking about, does this child truly target anyone? And when you look at the record, he is indiscriminate. And I hesitate to use that word because it has a legal meaning here, but he is grabbing everything. And if you look at his point sheets, which I would encourage the court to do, those are at 190 through 334 and 337 through 346. You get a sense of what a day in the life of SM is like. And he is touching everyone's feet when he's under the table during story time. He is taking their lunch. He's destroying their art. He's spitting. He's running away at recess. He's running away at the fire drill. He's running out of the classroom. He's lifting up student shirts. He's swatting people in the hallway when they walk by. He is profoundly disabled. And it is undisputed in this case that he is incapable of distinguishing between the genders and that his mannerisms and behavior are a direct function of his disabilities. And in that social context, in an elementary school where I think it's important to note, it's been a long time since I've been in elementary school, but I don't think that there's been a significant change in the staffing that is predominantly female. And at Providence Elementary School, you're simply just not going to have many males in a classroom or in the school at all. And these children are not going to be interacting with males on a regular basis. Is there any evidence in the record whether there was, whether or not there was a male in the classroom on a regular basis? Your Honor, there was no male. It was Ms. Ritchie, the other instructional assistant, Ms. Webster, and Ms. Ellerby, the teacher. And I think that it's important to note the role of an instructional assistant. They are the ones who are going to be spending the most time with these children on a more hands-on environment. So even if Ms. Ellerby is not being touched as often, it doesn't mean that she was not being targeted and that Ms. Webster was being singled out. I think just as a matter of common sense and day-to-day operations, Ms. Webster is the one holding his hand, walking him to the bathroom and walking him to the general education classes and overseeing his activities. So she is just closer to him. Her proximity sets her up to be close to him in a way that unfortunately means she is going to be... Statistically speaking, she's the one that may be touched more often. Yes, ma'am. Because she is in contact with him more often. Exactly. And that is why the training and her experience is so important. She understands what that means, what her job means. And I think it's important to note, and we've noted this throughout the case, is that an essential function of an instructional assistant is working with these children to teach them community skills, social skills, and to implement behavioral improvement. And so you're starting with a fairly low bar because these children do not have limits that general education students would know. Can I ask you a question about the imputation prong at the end? Because I really, I'm sort of stuck on this. You know, usually we ask whether, and let's assume for a minute the employer is on notice, Mr. Rucker is on notice. I'm just assuming that hypothetically. We usually then say, did the employer take prompt remedial action reasonably calculated to end the harassment? But that's not really what happened here. Here the employer just took the woman out of the line of fire. And under normal circumstances, right? If someone is complaining that at their law firm they have a colleague who keeps lifting up her skirt, we're not going to say, that's fine, you put the woman in a different office, right? Like that would not be an appropriate remedial response because you haven't done anything to actually make the harassment stop. So this is really just an open question for you. How should we be applying that prong in a context like this? Well, I think that under the facts of this case, separating them did make the harassment stop. And I think that it's important to know. But then she didn't want to be separated. Well, and I think, Your Honor, that what that goes to is, is whether she really believed it was sexual harassment up to that point. The fact she thought that it was. This whole thing, in my mind, goes to why there perhaps should not be and could not be a cognizable Title VII claim in a student-teacher context. I think that the difficulty in making that decision is that you can have, like you do in the Crist case, a 17-year-old, that's the case out of the Eighth Circuit, a, I believe he was actually 16 years old. He was over 200 pounds. Yes, sir. Six feet tall. Six feet tall. Over 200 pounds. He was post-pubescent and he was doing sexual things and the power dynamic had completely shifted in that situation because the woman was overpowered. He was pressing her against a wall. He knocked her unconscious, I believe, at one point. We don't have those facts here, but I hesitate to concede that there would be no student-on-teacher claim because I can see a situation where, like in Crist, you don't have the control over the student that you do in this case. And he would be more of a threat to any woman that he was around as opposed to SM being a little boy with, yes, ma'am. And did Crist involve a special needs student? Yes, ma'am. He was in a home for... That's all I needed to know. Yes. Can I go back to, you said that removing Ms. Webster from the situation stopped the harassment, but I don't understand that. What happened? Did SM stop doing this to whoever the new aid was in his classroom? Well, we, I don't know that that's in the record. What is, what we know is that no one else complained about SM's behavior. That's just a fact. Right. But I think we have to sort of assume your case, and again, I really am just trying to figure out how this would work. Your case sort of, I think, presupposes that SM does not stop doing this because this is in fact an ordinary manifestation of his difficulties. So I think we, I understand it's not in the record, but what I'm getting at is this is an unusual kind of a case because I assume the new instructor in this classroom, as you've adverted to, these are mostly women doing this work. She's probably a woman and probably the same thing is happening to her. She may not be complaining, which goes to the second prong of your case, that most special education teachers will not experience this as sexual harassment and as abusive. But if we're assuming sort of hypothetically for a minute that the first prongs are all met, that this is in fact an abusive work environment, it would be really unusual for a court to say, but you fixed the problem by putting a different woman in to absorb it. So I'm wondering whether we need sort of, like how, whether we should be asking a different sort of question instead of did you take steps reasonably calculated to end the harassment? Did you take whatever steps, you know, would be, and this is what other courts have done in cases like Chris, like they could have helped to address the problem, like better security, more staff, things like that. But I'm really just asking you because I find this really difficult to think about how this prong plays out in this context. Judge Harris, we agree with you and we have struggled to think about what would the remedy be in this case if the school board weren't entitled to summary judgment and we moved forward because it's a job. If no EMT liked blood and had to never show up on the scene because they didn't like blood, who is going to answer a 911 call? I mean, at some point the employee does not get to choose the remedial measure, but the employer has to balance, I think, its obligation in this case as a school board to provide free and accessible public education to these students and to mainstream them as much as possible. And we can't send them home and impose on the parents a duty to homeschool their children. We can't, in this case, he's so little, there's no detention. There's no, I believe, and I'm sorry, I don't have the citation. In one case that Mr. Hawkins cited, it was sufficient to spank a child. This is a relatively recent case, so it stood out to me. But the Court found that it was sufficient to spank a child. It's a recent case? Okay. You may recall it. I don't remember it. That that was deemed sufficient for purposes of taking care of the problem and showing the child that that behavior was not acceptable. Obviously, the school board does not take that position here, but I think that your question emphasizes how important it is to look at each of these cases on their own facts and their own circumstances. And on the facts and circumstances of this case, and to your point about it being a job, wasn't Ms. Webster moved from another classroom into this classroom because she had some sort of issue with the other classroom? Your Honor, I don't think that it's — At the beginning of the year, she didn't want to be in the other classroom. That's right. She — we had already responded to her concerns by putting her in this other classroom, and I think that it was — what we see throughout her statements in this case is that she wanted to return to her old classroom. She didn't feel like she should have been removed. She thought the teacher should have been removed, and that's consistent here. She didn't feel like she should be removed from working with the children. She thought they should be homeschooled. And at some point, you have to look at the general welfare of the children and the school as a whole and balance that against the employees' needs if they are truly — if there is truly a hostile work environment, which, of course, here we don't believe that there was. I think maybe that is what makes this case difficult, is that we don't think there was a hostile work environment. So it's difficult to determine what we should have done. Ordinarily, it would be — you would have to request to revisit the IEP and then determine things that you propose. Then you have a round of people, different psychologists, teachers, and everybody, and that would prove — then you have a whole set of due process rights and hearings for the child and the parents, right? So it's complicated all the way around. You're exactly right. There is a lot of procedure required when you're dealing with government, and that would be the procedure that should be followed. I believe that what is important legally in this case is that Ms. Webster bears the burden of establishing an issue of tribal fact in addition to proving all four elements of a hostile work environment claim. And we just don't have any evidence other than her own statements here. As the Court has noted, the experts do not think that this was unusual or beyond the pale. They think that it was extremely common, particularly given his age, and that his actions are a function of his disability. And it's important that even if the Court were to find that she had met one of the four elements, she has not met all of them, and that is her burden. So we don't believe that with the undisputed facts that we have and using common sense and social context, that the school board is not — is liable in this case, and we believe that it should be found to be entitled to summary judgment. And I'd be happy to answer any other questions. Thank you, Ms. Russell. Thank you, Your Honors. Mr. Hawkins, you have some time reserved. Thank you. Just briefly, to address first the issue of how Ms. Webster got from her old room to the new room, she did not ask to be transferred, and that's at JA-495. She was actually forcibly transferred. And she wanted to go back to the other — She wanted to go back, correct. And that was not the remedy that the school chose. That is an appropriate, you know, deference to the school system. That happens all the time. The employees don't get to pick and choose what they get. The question then becomes, was it an appropriate remedial measure? The response, I would say, to all of the questions focused on because of sex and whether or not a cognizable claim exists is to look at the Mongelli case, at least the first part of it, because that part we agree with. It relied on Chris. It didn't go into the comparator analysis that we spent some time on a few moments ago. And it said that you must focus on the conduct itself and focused on what happened to the individual. And it said that within this unique context, if you don't find that assaults like these constitute action because of sex, then you essentially immunize schools, and like employers, from all sorts of behavior that would otherwise constitute criminal behavior or assaulted behavior. And you essentially tell, and I think the words from Chris are insightful here, is that you essentially tell the employees, it says, a court's ruling otherwise would allow the employer to tell its employees that they assume the risk of working with developmentally disabled individuals and that they have no right to expect a safe working environment. And I want to dovetail that to say that in this case, and I know we've had some questions as to whether or not SM was acting in a normal manner for somebody in his condition, look at the May 9th letter from Dr. Rucker, which categorized the March 14th, the March 13th incident as a Title VII complaint, a founded Title VII violation. Title IX is exactly the same as Title VII in the sense that it requires behavior to be committed because of sex. If SM's behavior in March was because of sex, then all of the other behavior, although not as extreme, is exactly the kind of behavior that is because of sex. And so we submit that, one, we submit that a claim should be cognizable. If the court chooses not to recognize a claim like this, on these facts or any similar facts, it essentially shuts the courthouse doors to all individuals in Ms. Webster's position, whether they be an instructional aide or whether they be a teacher, and puts them essentially at the mercy of the classrooms they teach in and at the schools that they work for. We don't submit that that should be the law. And we submit that teachers in this context should be afforded the same rights as everybody else in the sense that they should have no higher burden than anybody else in a Title VII sexual harassment claim. We submit no circuit has spoken on this. We submit the Fourth Circuit should recognize the claim and should allow Ms. Webster to proceed to summary or to proceed to trial. We ask that the decision be vacated and reversed and that we be allowed to go to trial. Thank you. Thank you, Mr. Russell. And again, thank you, both counsel, for your arguments.
judges: Roger L. Gregory, Stephanie D. Thacker, Pamela A. Harris